IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FILED**

**OCT 28 2016**

U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| MONTANA HEALTH CO-OP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. _____ |
| | ) **16 - 1427 ¹C** |
| THE UNITED STATES OF AMERICA, | ) **COMPLAINT** |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff Montana Health CO-OP ("Plaintiff" or "Montana Health") brings this action

seeking damages and other relief for the Defendant's violation of Section 1342 of the Patient

Protection and Affordable Care Act ("Section 1342") and 45 C.F.R. § 153.510(b) ("Section

153.510"), as well as the Defendant's breach of its risk corridors payment obligations under an

implied-in-fact contract.  In support of this action, Plaintiff states and alleges as follows:

## NATURE OF ACTION

1.      In March 2010, the United States Government ("Defendant" or "Government")

enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), 124

Stat. 119 and the Health Care and Education Reconciliation Act, Pub. L. 111-152, (March 30,

2010), 124 Stat. 1029 (collectively the "Affordable Care Act" or the "Act" or "ACA").

2.      The Act represented a major shift in healthcare regulation and coverage in the

country.  The ACA ushered in a host of market-wide reforms and requirements affecting the

private health insurance industry.  Among other things, the Act addressed the scope of covered

services, availability of coverage, renewability of coverage, out-of-pocket costs for consumers,

pricing, and other coverage determinants.  The Act limits health insurance product variation and

restricts pricing and underwriting practices.  For example, by placing restrictions on the premium

spread based on the age of the policy holder, the Act ensures that premiums are based on

community rating (*i.e.*, the risk pool posed by the entire community) instead of an assessment of

an individual's health status.  The Act also provides for guaranteed issuance of coverage and

renewability of coverage.

3.      The ACA requires individuals to purchase coverage if they are not otherwise

insured, but also created an elaborate scheme of federal subsidies to offset the cost of coverage.

Another of the hallmarks of the Act was its establishment of health insurance exchanges, which

are online marketplaces through which individuals may purchase health insurance.  The ACA's

individual mandate coupled with the availability of federal subsidies dramatically increased the

number of individuals—many previously uninsured—purchasing health insurance.  Created by

Title I, Subtitle D of the ACA, the health insurance exchanges "are designed to bring together

buyers and sellers of insurance, with the goal of increasing access to coverage" offered in a

competitive marketplace.

4.      To further facilitate affordability and access to competitive health insurance

through the exchanges (also referred to as "Marketplaces"), Congress created the Consumer

Operated and Oriented Plan ("CO-OP") program in ACA Section 1322.  ACA Section

1322(a)(2) explicitly states that, "the purpose of the CO-OP program [is] to foster the creation of

qualified nonprofit health insurance issuers to offer qualified health plans in the individual and

small group markets."  A qualified health plan ("QHP") is a health plan that meets certain

standards established by the Centers for Medicare & Medicaid Services ("CMS") and by the

exchanges in order to be sold to consumers through the exchanges.  Congress intended for CO-

OP insurers to increase competition among health insurers and to provide consumers with a

2

nonprofit option for high-quality care with integrated service delivery. The ACA requires CO-OP insurers to derive substantially all of their business from the individual and small group markets—the markets served by the exchanges.

5.      Additionally, the ACA requires health plans in the individual and small group markets to cover essential health benefits ("EHBs"), which include items and services in the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care. In many cases, the EHBs are an expansion of what was covered pre-ACA. Benefits previously subject to copays or other cost-sharing mechanisms are now mandated to be provided at no cost to the insured, making it difficult to predict utilization of these services.

6.      The health insurance exchanges presented a new and uncertain risk pool for health insurers. Health insurers were obligated to confront the uncertainties of pricing health plans for new populations. Insurers did not have sufficient data or tools to accurately predict the needs of the newly insured individuals signing up for plans starting in 2014, nor a model to confidently price these ACA plans to reflect the medical costs associated with this new and untested marketplace.

7.      Acknowledging these uncertainties, the ACA features three marketplace premium stabilization programs, including a temporary "risk corridors" program for each of the 2014, 2015, and 2016 benefit years (a "benefit year" is the calendar year for which a health plan provides coverage for health benefits). These premium stabilization programs were designed to

limit the effects of adverse selection and to mitigate the uncertainty inherent in establishing rates for new, unquantifiable health insurance risks in the context of an untested regulatory framework and against the backdrop of a highly competitive and price-sensitive marketplace. The risk corridors program in particular calls for plans that realize lower-than-expected allowable costs in the benefit year to pay a portion of the differential to the Government, and, conversely, for the Government to pay a portion of the differential to plans that realize higher-than-expected allowable costs in a benefit year.

8.     The risk corridors program specifically guarantees that if an insurer's allowable costs "for any plan year" exceeded the target amount, the U.S. Department of Health & Human Services ("HHS") "shall pay to the plan" pursuant to the payment-calculation formula set forth in the ACA.

9.     The risk corridors program is modeled after a similar program enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act signed into law in 2003. Specifically, Section 1342 of the ACA contains two related mandatory terms for all issuers of QHPs on an exchange: (1) any health insurer selling a QHP on the exchange (a "QHP issuer") would receive compensation from the Government if its losses exceeded a certain defined amount due to high utilization and high medical costs; and (2) the QHP issuers would pay the Government a percentage of any gains they made in excess of similarly defined amounts. The Act's framework thus compares "allowable costs" (essentially claims costs and adjustments for quality improvement activities, reinsurance, and risk adjustment charges or payments) with a "target amount" (the QHP's premium less its allocable administrative costs). If the ratio of a QHP issuer's allowable costs to the target amount is greater than 1, then it experiences losses; but if the ratio is less than 1, then it experiences gains.

4

10.     The only significant precondition for the Government's payment obligations is the calculation of revenue and cost data submitted to CMS by the insurers.

11.     Despite these express and binding obligations, the risk corridors program—like the ACA as a whole—has been the target of subsequent congressional actions designed to impede CMS's ability to administer the program as mandated by the ACA.  In particular, in the Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235) ("2015 Spending Bill") and, a year later, the Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113) ("2016 Spending Bill"), Congress prohibited CMS and its parent agency, HHS, from using certain accounts to fund the obligated risk corridors payments.  Specifically, Congress prohibited CMS from using the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, as well as funds transferred from other accounts funded by the 2015 Spending Bill and 2016 Spending Bill to the CMS Program Management account for fiscal year 2015 and 2016.

12.     Following passage of the 2015 Spending Bill, CMS did not pay QHP issuers their full risk corridors receivable amounts due for 2014.  During 2014, QHP issuers incurred almost $2.9 billion in losses that were compensable under the risk corridors provisions of the ACA. However, following the 2015 Spending Bill, over $2.5 billion of those mandatory risk corridors payments for 2014 were not paid.

13.     On information and belief, the QHP issuers incurred even greater compensable losses in 2015, following passage of the 2016 Spending Bill.

14.     Nevertheless, Congress did not otherwise restrict availability of federal funds and did not amend Section 1342 to limit, much less eliminate, the Government's risk corridors payment obligations to insurers under the ACA.

15.     Plaintiff in this action is a non-profit corporation organized under the laws of Montana, with its principal place of business in Helena, Montana.  Plaintiff is a QHP issuer under the ACA.

16.     In 2014 and 2015, Plaintiff provided health insurance to its members on the federally facilitated Marketplace in Montana.  In 2015, Plaintiff provided health insurance to its members on the federally facilitated Marketplace in Idaho, where it does business as Mountain Health CO-OP.

17.     CMS has conceded that Plaintiff was owed $6,816,511.13 under the risk corridors program for its participation in the Montana Marketplace for benefit year 2014.  Payments of $873,262.99 have been received under the risk corridors program for 2014, so the balance of $5,943,248.14 remains unpaid.  In addition, Plaintiff is owed $36,250,130.00 for its participation in the Montana and Idaho Marketplaces for benefit year 2015.

18.     To date, however, CMS has stated publicly in sub-regulatory guidance that it will not make full payment for benefit years 2014 and 2015 until a later—but as-of-yet undetermined—date, if at all.  This is despite expressly admitting on multiple occasions, including letters to Montana Health, that the full risk corridors payments are due and owing.  In an October 2015 letter, the Government expressly stated that "HHS is recording those amounts that remain unpaid following our 12.6 percent payment this winter *as a fiscal year 2015 obligation of the United States Government for which full payment is required*."

19.     Risk corridors program payments for both the 2014 and 2015 benefit years are presently due to Montana Health.  By this lawsuit, Plaintiff seeks full payment of the risk corridors payments it is entitled to from the Government under the ACA for benefit years 2014

6

and 2015. The law is clear, and the Government must abide by its statutory obligations. Plaintiff respectfully asks the Court to compel the Government to do so.

**JURISDICTION**

20.     This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491. The statutory cause of action giving rise to this Court's Tucker Act jurisdiction is Section 1342, a money-mandating statute that requires payment from the federal government to QHP issuers, like Plaintiff, that satisfy certain criteria. Section 153.510(b) is a money-mandating regulation that implements Section 1342 and thus also obligates payment from the federal government to QHP issuers that satisfy certain criteria.

21.     In the alternative, Plaintiff brings a claim for damages over $10,000 against the Government founded upon the Government's violation of an implied-in-fact contract, over which this Court also has jurisdiction pursuant to the Tucker Act.

22.     This controversy is ripe because CMS has refused to pay Plaintiff the full amount Plaintiff is owed for 2014 and 2015 as required by Section 1342 and Section 153.510.

**PARTIES**

23.     Plaintiff, Montana Health, is a non-profit health service corporation organized under the laws of Montana, with its principal place of business in Helena, Montana.

24.     Montana Health is a member-led QHP issuer on the exchanges in the State of Montana and the State of Idaho (d/b/a Mountain Health CO-OP). It is organized as a non-profit under the CO-OP model and offers comprehensive health insurance benefits to individuals, families, and businesses in Montana and Idaho. Its stated mission is to offer non-profit member-governed health insurance that promotes member engagement and provides access to

7

high quality medical care.  It is the only non-profit CO-OP insurer in Montana and Idaho.

25.     Montana Health began providing affordable, high-quality health plans in Montana in 2014.  In 2015, Montana Health's enrollment grew to 42,302 members, making it the second largest writer of individual health insurance in the State of Montana.  In its first year of operations, Montana Health attracted 40 percent of the exchange enrollment in the state.  But for Montana Health's existence, there would have been only two carriers on Montana's individual Marketplace in 2014.  Currently, Montana Health insures 19 percent of the state's individual Marketplace.  Doing business as Mountain Health CO-OP, Montana Health started providing the same affordable and high-quality coverage in Idaho in 2015, where it now enrolls nearly 18% of the State's exchange membership.

26.     In both Montana and Idaho, Montana Health met with community leaders, navigators, citizen groups, insurance producers and health care providers throughout both Montana and Idaho to educate them about the benefits of the new Marketplaces and encourage enrollment, thus promoting the success and objectives of the ACA.

27.     In its outreach efforts, Montana Health targeted underserved populations, including tribal communities and highly uninsured rural populations without employer based health systems, to advance the ACA objectives of covering the uninsured.

28.     In further service of ACA objectives, Montana Health in 2014 was the only carrier on the Montana exchange to offer Platinum-level coverage, providing the most comprehensive coverage to the sickest enrollees.  As a result, Montana Health incurred the highest costs by covering the enrollees who need the most expensive care in 2014.

29.     Montana Health is the only Montana-based insurance company on the Montana

8

exchange.  In both Montana and Idaho, Montana Health provides the highest level of

transparency to its members and members represent a majority of the CO-OPs board of

directors.  Montana Health's administrative costs are among the lowest of all exchanged based

carriers nationally and Montana Health offers some of the most affordable exchange based

products in both Montana and Idaho.

30.     The Defendant is the Government, acting through CMS (or CMS's parent

agency HHS).  Unless otherwise noted, references in this Complaint to CMS include HHS

where applicable.

## FACTUAL ALLEGATIONS

### A.     The Affordable Care Act Established a "Risk Corridors" Program with Separate Two-Way Payment Obligations.

31.     The Affordable Care Act established three insurance premium stabilization

programs to address uncertainties in the Marketplace, commonly referred to as the "Three Rs":

(1) a three-year risk corridors program; (2) a three-year reinsurance program; and (3) a

permanent risk adjustment program.  Both the reinsurance and risk corridors programs began in

2014 and will conclude at the end of 2016.

32.     Section 1342 of the Affordable Care Act, as codified at 42 U.S.C. § 18062,

created the risk corridors program.  In relevant part that Section states:

> (a) IN GENERAL.—The Secretary *shall* establish and administer a program of
> risk corridors for calendar years 2014, 2015, and 2016 under which a qualified
> health plan offered in the individual or small group market *shall* participate in a
> payment adjustment system based on the ratio of the allowable costs of the plan to
> the plan's aggregate premiums. Such program *shall* be based on the program for
> regional participating provider organizations under part D of title XVIII of the
> Social Security Act.
>
> (b) PAYMENT METHODOLOGY.—

(1)  PAYMENTS OUT.—The Secretary shall provide under the program established under subsection (a) that if—

(A)  a participating plan's allowable costs *for any plan year* are more than 103 percent but not more than 108 of the target amount, the Secretary *shall pay to the plan* an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and

(B)  a participating plan's allowable costs *for any plan year* are more than 108 percent of the target amount, the Secretary *shall pay to the plan* an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the allowable costs in excess of 108 percent of the target amount.

Pub. L. No. 111-148, § 1342 (emphasis added).  Section 1342 also includes a provision dealing with "payments in," requiring QHP issuers to pay amounts to HHS if the plans' actual costs are less than its targeted costs.  *Id.* at § 1342(b)(2).  For both the "payments out" and "payments in" provisions, the terms "allowable costs" and "target amount" are defined by the statute.  *Id.* at § 1342(c).

33.     HHS implemented the risk corridors program in the Code of Federal Regulations at 45 C.F.R. § 153.510.  In relevant part, Section 153.510 states:

(b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:

(1)     When a QHP's allowable costs *for any benefit year* are more than 103 percent but not more than 108 percent of the target amount, *HHS will pay the QHP issuer* an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and

(2)     When a QHP's allowable costs *for any benefit year* are more than 108 percent of the target amount, *HHS will pay to the QHP issuer* an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(emphasis added).

10

34.     This regulation and other regulations adopted by HHS further mandate certain data reporting requirements and deadlines applicable to the QHP issuers.  45 C.F.R. §§ 153.510, 153.530.  Following verification by HHS of the QHP issuers' data submissions, HHS is required to pay the insurers based on the plan's excess expenses (one amount for expenses greater than 103 percent and another amount for expenses greater than 108 percent of each QHP issuer's target amount).

35.     The QHP issuers' and the Government's respective payment obligations pursuant to Section 1342 are graphically depicted in the following chart from the American Academy of Actuaries:



36.     The purpose of the risk corridors program—in conjunction with the other of the Three Rs—was to induce health insurer participation in the health insurance exchanges by mitigating their risk of loss.  Congress recognized that this could only work effectively if the payment obligations were honored on an annual benefit or plan year basis—the program would hardly be able to serve its purpose of mitigation if, after incurring potentially millions of dollars

11

in unbudgeted expenditures over a plan year, new and relatively small non-profit QHP issuers like Montana Health, that lacked substantial resources, and that were created directly in response to the ACA's call for creation of non-profit consumer sponsored CO-OP plans, could not timely collect the reimbursements owed to them by the Government pursuant to the statutory formula as soon as the plan's accounting for the preceding year was finalized establishing the amounts owed.

37.     Section 1342 does not establish a fund into which QHP issuers must make payments due or from which payments must be made under the risk corridors program, *i.e.*, the statute does not create a single account to service both payments in and payments out.  Nor does the statute provide that the risk corridors program must be budget neutral—in other words, payments out are *not* subject to payments in, and vice versa.  The statute is clear that the Government will share in the losses for plans with higher than anticipated costs so that if, hypothetically, all plans have higher than anticipated costs, the Government would need to make payments, even though there would be no insurer payments coming in.  The program could not have been subject to budget neutrality for the reason stated in the preceding paragraph—had the program been cabined by budget neutrality concerns, the ACA would have failed to attract sufficient entrants into the Marketplace because the investment would have been too risky. HHS's timely payment to plans under the risk corridors program is essential to realizing the ACA's intent that the program stabilize premiums.  Indeed, Section 1342 is modeled for just that reason on the Medicare Part D program, which is also not required to be budget neutral.  *See* 42 C.F.R. § 423.336.

**B.     QHP Issuers Participated in Exchanges and Set Prices in Reliance on the Risk Corridors Program.**

38.     As noted above, the ACA's health insurance exchanges became operational for

the 2014 benefit year.  To participate on the health insurance exchanges for the 2014 benefit

year, health insurers had to submit their premiums to the Government by May 2013.  Their

commitment to participate on the Exchange was fixed and irrevocable by September 2013.

Montana Health and other insurers entered onto the exchanges with the express understanding –

based on the plain text of Section 1342—that if their allowable costs "for any *plan year*"

exceeded the target amount, the Secretary "*shall pay to the plan*" the amounts set forth in the

ACA.  The implementing regulations at 45 C.F.R. § 153.510 expressly reiterated this ACA

requirement, stating that when a QHP's allowable costs "for any *benefit year*" exceeded the

target amount, "*HHS will pay the QHP issuer*" the amounts set forth in the ACA.  The

Government gave no indication at that time that it would subsequently refuse to pay its risk

corridors obligations, or hold payments due for a particular plan year until a later and indefinite

date.

   39. Health insurers relied on the statutorily mandated risk corridors program and the

other premium stabilization programs in agreeing to participate on the exchanges and in setting

their premiums for each year of the risk corridors program.  It was not until October 2015, long

after health insurers had set premiums and agreed to participate for the last year of the risk

corridors program, that the Government *first* indicated that it would pay only 12.6 percent of its

obligations under the risk corridors program for the 2014 benefit year.

   40. The premium stabilization programs of the ACA were essential to expanding the

risk tolerance of new entrants, such as Plaintiff, to the Marketplace.  The existence of the risk

corridors program safeguards helped to prevent unnecessarily high rates to offset the many

uncertainties of the newly developing individual market that otherwise made it difficult to create

budgets and forecasts.

41.     Montana Health's premium rates—for Montana in 2014 and 2015 and for Idaho in 2015—were set by Montana Health in consultation with Milliman actuaries. Because regulators required the rates for 2015 to be filed in early 2014 (before claims data for 2014 was available), rates for both 2014 and 2015 were set without the benefit of claims data. The unknown quality of the risk pool in the new marketplaces and significant changes in the regulatory framework made the rate-setting process inherently uncertain. From a spectrum of justifiable rates in these new and uncertain marketplaces, Montana Health and Milliman selected rates that were lower and therefore more competitive because of the risk corridor payment program, the clear statutory language concerning the program, and CMS's express assurances to Montana Health that the full risk corridor amounts would be paid. These factors were especially important in the rate setting process because CMS required CO-OPs to maintain a higher level of capital than is otherwise required under the state insurance codes. Without the risk corridor program, Montana Health would have charged higher premiums and would not have offered Platinum coverage in 2014.

42.     When it enacted the ACA, Congress understood that each new marketplace presented both an unknown risk pool and a highly competitive rating environment that together created a substantial risk of inaccurate pricing. The risk corridor program was specifically designed to address the uncertainty and volatility in the rate setting process during the first three years of the new marketplaces.

**C.     The Risk Corridors Program is Contravened After Enactment.**

43.     Since its enactment, Congress has not altered the Government's obligations under the ACA's risk corridors program. Despite this, the Government has taken several steps to frustrate the purpose it was intended to serve: timely and complete payment to QHP issuers in

order to permit them to survive, learn from, and adapt to this uncharted new market.

44.     The first such step was in March 2014, when HHS unexpectedly took the position in sub-regulatory guidance that the risk corridors program would be self-funding or "budget-neutral." Each spring, HHS publishes an annual rulemaking articulating the payment policies and requirements for participation in the ACA Marketplaces, the so-called annual Payment Rule. Specifically, in the preamble to the 2015 Payment Rule, issued in March 2014, and related guidance issued in April 2014, HHS indicated that it would attempt to administer the risk corridors program in a budget-neutral manner and would offset liabilities with future collections.

45.     The preamble to the 2015 Payment Rule stated:

> [w]e intend to implement this program in a budget-neutral manner, and may make future adjustments, either upward or downward to this program (for example, as discussed below, we may modify the ceiling on allowable administrative costs) to the extent necessary to achieve this goal.

46.     Then, in April 2014, CMS issued a statement entitled "Risk Corridors and Budget Neutrality," asserting:

> [I]f risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

47.     That 2014 guidance radically departed from what the ACA intended and requires and what the implementing regulation reflected: the risk corridors program was enacted without regard to annual budget neutrality. Indeed, in its 2016 Payment Rule, issued February 27, 2015, HHS conceded as much, stating that "[t]he risk corridors program is not statutorily required to be budget neutral." To the contrary, Congress stated expressly in Section 1342 that the risk corridors program was to be modeled after the Medicare Part D risk mitigation program, which is

15

not budget neutral. *See* U.S. Gov't Accountability Office, GAO Report GAO-15-447 (April

2015) at 14 (available at http://www.gao.gov/assets/680/670161.pdf) ("For the Medicare

Advantage and Medicare Part D risk mitigation programs, the payments that CMS makes to

issuers are not limited to issuer contributions.").

48.    In short, the Government announced by agency fiat in the spring of 2014 that it

would aspire to administer the risk corridors program in a budget neutral manner

notwithstanding the lack of any statutory basis for doing so, and then reiterated that position for

years 2015 and 2016 pointing to the April 11, 2014 "FAQ" on Risk Corridors and Budget

Neutrality, suggesting that any decision on how the Government would make QHP issuers whole

under the risk corridors programs would be left to some indeterminate later day.

49.    The Government's budget neutrality approach is not supported by law.  Neither

Section 1342 nor Section 153.510 provides that the risk corridors payments will come from the

pot of payments made to the Government by other insurers (*i.e.*, payments in).  Nor does either

provision contemplate permitting the Government to postpone payments that are owed until the

following year's collections are accounted for (or, as it seems might be the case should HHS

have its way, some indeterminate date in the future, if at all).

50.    By letter to Montana Health of October 26, 2015, announcing that it would only

pay 12.6% of the amounts due to Montana Health under the risk corridors program, CMS

acknowledged that the ACA "***requires*** the Secretary to make full payments to issuers," and that

the unpaid amounts would be recorded as "obligations of the United States Government for

which ***full payment is required***."

51.    Less than a month later, on November 19, 2015, the Government again stated that

"HHS is recording those amounts that remain unpaid following our 12.6 percent payment this

winter *as a fiscal year 2015 obligation of the United States Government for which full payment is required.*" CMS, Risk Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015).

52.     These statements are extraordinary in that the agency *concedes* that it owes Plaintiff and other QHP issuers payment under the risk corridors program, *refuses* to pay the amounts due, and offers instead to pay "12.6 percent" of what is owed with a vague promise to pay more at some indeterminate point in the future.

**D.     Congress Refuses to Appropriate Funds for the Risk Corridors Program.**

53.     Congress has repeatedly sought to frustrate the aims of the risk corridors program. In December 2014, Congress passed the 2015 Spending Bill.  This Act prohibited the use of Medicare and certain other trust funds for fiscal year 2015 for risk corridors payments.  The two funds specifically mentioned in the 2015 Budget Act as sources from which risk corridors payments may not be drawn are designated throughout Division G of the 2015 Budget Act to fund other programs and initiatives under HHS.  However, the 2015 Budget Act did not eliminate the use of all funds in the CMS Program Management account, such as fees received by HHS for the federally facilitated exchanges.  It also did not apply to years other than the fiscal year ending September 30, 2015.  Most notably, Congress *did not amend Section 1342 to require budget neutrality or to alter the underlying risk corridors obligations of the Government.*

54.     The 2015 Spending Bill was enacted on December 16, 2014, nearly a year after Plaintiff began offering insurance on the ACA exchange in Montana and approximately 18 months after it had submitted rates for regulatory approval.  Faced with this new development, Plaintiff continued to abide by its obligations to the Government and its insured, but received little immediate guidance as to what would happen with the risk corridors payments.

55.     In December 2015, Congress passed the 2016 Spending Bill, which continued the

limits on the availability of funding for the risk corridors program. As in the 2015 Spending Bill, the 2016 Spending Bill prohibited CMS from using trust funds and other accounts for the fiscal year ending September 30, 2016 to fund risk corridors payments. But, like the 2015 Spending Bill, *it did not amend Section 1342 to require budget neutrality or alter the underlying risk corridors obligations of the Government.*

56.      On September 9, 2016, CMS issued a memorandum reiterating the agency's understanding that the Government owed "full" payment to insurers.[1]  That memorandum was followed by testimony of CMS Acting Administrator Andy Slavitt before the House Energy and Commerce Committee on September 14, 2016. Among other things, Mr. Slavitt stated without equivocation in response to a question posed by Representative Morgan Griffith that, notwithstanding the lack of an appropriation to fund the payments due insurers under Section 1342, such payments were "an obligation of the federal government" to remit full payment to insurers.[2]

57.      CMS' concession drew an immediate response from the House majority. In a letter of September 20, 2016 to HHS Secretary Sylvia Burwell, the leadership of the House Energy and Commerce Committee took issue with the positions expressed by CMS and Acting Administrator Slavitt, and demanded production by CMS of certain information and documents,

---

[1] CENTER FOR MEDICARE & MEDICAID SERVICES (CMS), LETTER TO QHP ISSUERS RE: RISK CORRIDORS PAYMENTS FOR 2015 LETTER TO QHP ISSUERS RE: RISK CORRIDORS PAYMENTS FOR 2015 (2016), https://www.cms.gov/cciio/programs-and-initiatives/premium-stabilization-programs/downloads/risk-corridors-for-2015-final.pdf.

[2] CENTER FOR MEDICARE & MEDICAID SERVICES (CMS), STATEMENT OF ANDY SLAVITT ACTING ADMINISTRATOR CMS ON THE ACA BEFORE THE UNITED STATES HOUSE COMMITTEE ON ENERGY STATEMENT OF ANDY SLAVITT ACTING ADMINISTRATOR CMS ON THE ACA BEFORE THE UNITED STATES HOUSE COMMITTEE ON ENERGY, http://docs.house.gov/meetings/IF/IF02/20160914/105306/HHRG-114-IF02-Wstate-SlavittA-20160914.pdf.

including, among other things, the basis for CMS's viewpoint that the Government is obligated "to make insurers whole," the names of agency officials involved in discussions with Department of Justice about "risk corridors" litigation (such as the case at bar), and CMS's position on the use off the Judgment Fund to settle the Government's Section 1342 obligations.[3]

58.     The letter to Secretary Burwell was followed by letters sent by the same House Committee on or around October 4, 2016 to the chief executives of each of the QHPs that had, as of that date, filed complaints against the Government in the Court of Federal Claims seeking recovery of the risk corridors payments owed to them.  Those letters demanded (1) by October 10, 2016, "a briefing to Committee staff" (presumably regarding the subject litigation and related settlement efforts) and (2) by October 17, 2016, all documents and communications between the insurers and Executive Branch employees regarding lawsuits such as the one at bar, and also documents and communications wholly internal to the insurance companies that referenced any such correspondence with Executive Branch employees.[4]

**E.     Plaintiff Has Suffered Substantial Harm as a Result of the Government's Refusal to Pay Amounts Owed.**

59.     Montana Health was one of the initial seven CO-OPs funded across the country, in February 2012, pursuant to the ACA, to inject competition into the insurance market through non-profit, consumer-focused health plans.  The ACA requires CO-OPs to derive substantially

---

[3] HOUSE OF REPRESENTATIVES & COMMITTEE ON ENERGY AND COMMERCE, LETTER TO THE HONORABLE SYLVIA BURWELL LETTER TO THE HONORABLE SYLVIA BURWELL, https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/document s/114/letters/20160920HHS.pdf.

[4] HOUSE OF REPRESENTATIVES & COMMITTEE ON ENERGY AND COMMERCE, LETTER TO THE INSURERS, https://energycommerce.house.gov/news-center/letters/letter-insurers-risk-corridors-program.

it enacted the American Taxpayer Relief Act of 2012 (Pub. L. No. 112-240, H.R. 8, 126 Stat. 2313) (Jan. 2, 2013), Congress slashed about two-thirds of this funding and prevented CMS from making new loan awards or entering into new loan agreements with CO-OPs. This action left many CO-OPs in challenging financial conditions.

60.     An issuer of QHPs is required by federal regulations to set its ACA-related health insurance rates well before the year they become effective. This creates a challenge for a nonprofit CO-OP, like Montana Health, which seeks to insure individuals who were previously uninsured and whose use of medical services once covered is difficult to predict.

61.     In 2014, Montana Health exceeded its membership expectations by 50 percent, while attaining 40 percent of the total individual Marketplace by the end of the first Open Enrollment period.

62.     In 2015, Montana Health increased its membership by 250 percent. Its policyholders, many of whom had been uninsured before, accessed health care at a higher-than-anticipated rate, causing an unanticipated spike in costs.

63.     Montana Health imposed marginal rate increases on premiums between 2014 and 2015, based on the best information available to it at the time, and gained so many new enrollees that the total value of premiums collected increased nearly 90 percent in 2015 compared to 2014. However, its benefits payments for health care services to its members grew, ultimately causing Montana Health to suffer an underwriting loss of more than $40 million for 2015.

64.     In response, Montana Health reduced its already conservative administrative spending from 2015 to 2016.

65.     Notwithstanding these cuts, the great majority of Montana Health's financial shortfall is attributable to higher-than-expected allowable costs that are exactly those specifically

addressed by the risk corridors program, *i.e.*, excessive losses incurred as a result of Montana

Health's participation on the Exchange.

66.     Section 1342 of the ACA requires the Government to reimburse Montana Health

for these pursuant to the statutory formula, just as Section 1342 requires Montana Health to pay

CMS for lower-than-expected allowable costs.

67.     The risk corridors program is one of the principal Marketplace premium

stabilization programs created by the ACA.  It is designed to *limit* the effects of adverse selection

and to *mitigate* the uncertainty inherent in building rates for new, unquantified health insurance

risks in the context of a reformed regulatory framework.  While it might be an aspiration *of HHS*,

for convenience as the program administrator, that the risk corridors program operate in a budget

neutral manner that allows it to simply redistribute the premium revenues paid back into the

program (from plans with lower-than-expected allowable costs) to those plans with higher-than-

expected allowable costs, the risk corridors program was specifically crafted *by Congress* to

avoid that linkage.  Under Section 1342, payments out are not contingent on payments in.

68.     On November 19, 2015, CMS released a document titled "Risk Corridors

Payment and Charge Amounts for Benefit Year 2014," setting forth the amount of money CMS

concedes that it owes to insurers (and is owed by insurers) for benefit year 2014 as a result of the

risk corridors program.  The calculations are separated into individual market and small group

market.  For benefit year 2014, Montana Health was *owed* $6,754,127.62 under the risk corridors

program as a result of higher-than-expected allowable costs in the individual market.  To date,

CMS has paid only $852,226.81— or 12.6 percent—of the amount CMS concedes that it owes to

Montana Health for benefit year 2014.  An additional payment of $13,164.71 was received in

October 2016 although the payment did not indicate if it related to individual or small group

amounts owed.

69.     Similarly, CMS determined that Montana Health was *owed* $62,383.51 under the risk corridors program as a result of higher-than-expected allowable costs in the small group market.  To date, CMS has paid only $7,871.47—or 12.6 percent—of the amount CMS concedes that it owes to Montana Health for benefit year 2014.

70.     On or about July 31, 2016, Montana Health submitted to HHS all data required by the ACA demonstrating that Montana Health experienced higher-than-expected allowable costs under to the risk corridors program for benefit year 2015, entitling Montana Health to payment by HHS in the amount of $36,250,130 (as calculated pursuant to the formula prescribed in ACA Section 1342) at that time.

**F.     2014 Risk Corridors Payments Owed to Plaintiff**

71.     Pursuant to its obligations under the ACA and 45 C.F.R. § 153.500 *et seq.*, Plaintiff complied with its statutory requirements throughout the year and submitted all required data for the risk corridors calculations by the statutory deadline of July 31, 2015.  *See* 45 C.F.R. § 153.530(d).

72.     On October 1, 2015, HHS announced that funds paid by QHP issuers into the risk corridors program (payments in) would only be sufficient to cover 12.6 percent of risk corridors payment requests (payments out).  Based on the Government's own official calculation, QHP issuers generated $362 million in risk corridors gains for the Government, but QHP issuers suffered $2.87 billion in compensable risk corridors losses.  The 12.6 percent that could be paid reflected a prorated redistribution of the $362 million received from the few insurers that were required to pay the Government for the 2014 program year.

73.     As a result, although CMS conceded that Montana Health is entitled to

22

$6,816,511.13 from the risk corridors program for the 2014 program year, the agency only paid $860,098.28 of this amount, or approximately 12.6 percent in the initial payment and an additional $13,164.71 in October 2016.

74.     With respect to its partial payments for benefit year 2014, HHS stated that it was "recording those amounts that remain[ed] unpaid following [its] 12.6 percent payment this winter as a fiscal year 2015 obligation of the United States Government for which full payment is required." CMS, Risk Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015).

75.     HHS' unilateral decision to pay only a small fraction of the amounts that it owes contradicts the express language of Section 1342, which states that if a plan's allowable costs "for any ***plan year***" exceeds the target amount, the Secretary "***shall pay to the plan***" the amounts set forth in the ACA.  The implementing regulations at 45 C.F.R § 153.510 expressly reiterate when a QHP's allowable costs "for any ***benefit year***" exceeded the target amount, "***HHS will pay the QHP issuer***" the amounts set forth in the ACA.

76.     HHS has provided no coherent explanation for its decision to short-pay health plans. HHS stated that "[t]he risk corridors payments for program year 2014 [would] be paid in late 2015.  The remaining 2014 risk corridors claims will be paid out of 2015 risk corridors collections, and if necessary, 2016 collections." HHS concluded that in the event of a shortfall for the 2016 program year, HHS "***will explore other sources of funding for risk corridors payments, subject to the availability of appropriations***.  This includes working with Congress on the necessary funding for outstanding risk corridors payments." HHS, has therefore, refused to pay an "obligation of the United States Government for which full payment is required," and seeks to leave its payment of this debt completely open-ended.

77.     The ACA called for creation of non-profit consumer sponsored CO-OP plans to

fulfill a critical component of the law's goal of expanding healthcare access. The Government, by refusing to meet its payment obligations under the risk corridors program in violation of Section 1342, abrogates its responsibility with respect to one of the key features of the ACA, *i.e.*, providing market-stabilization in the new exchanges.

78.     For a non-profit CO-OP like Montana Health, the Government's refusal to pay money due under the risk corridors program gives rise to significant financial difficulties. While more than half the CO-OPs created under the ACA have failed, Montana Health has fought to continue in operation to fulfill its mission of increasing the accessibility of healthcare coverage to individuals who traditionally lacked sufficient coverage. Withholding risk corridors payments defeats the very purpose of the risk corridors program—mitigation of the risk that CO-OPs were otherwise assuming by entering the expanded health insurance marketplace in answer to the ACA's challenge to assure the availability of affordable health insurance coverage for all Americans. Withholding the payments violates both the letter and the spirit of the law.

**G.     2015 Risk Corridors Payments Owed to Plaintiff**

79.     As it did in relation to its 2014 risk corridors payments, Plaintiff complied with its statutory requirements and submitted to HHS all data required by the ACA demonstrating that Montana Health experienced higher-than-expected allowable costs under the risk corridors program for benefit year 2015, entitling Montana Health to payment by HHS in the amount of $36,250,130.00 (as calculated pursuant to the formula prescribed in ACA Section 1342).

80.     Yet again, however, HHS has signaled it will not make full payment as required by the ACA. Similar to the 2015 Spending Bill, the 2016 Spending Bill prevents CMS and HHS from making risk corridors payments for certain funding sources. For its part, HHS has indicated that it will continue to treat the risk corridors program as "budget neutral" (although

there is no basis in the ACA for doing so), and will use any funds received from QHP issuers for the 2015 risk corridors results to first pay down the $2.5 billion shortfall from 2014.

81.     In doing so, the Government has conceded that it will fail to meet its risk corridors obligations for 2015 as well.  Meanwhile, market analysts have predicted that the amount of risk corridors underfunding for 2015 will be at or near the same $2.5 billion level as 2014. *See, e.g.*, Banerjee, D. et al., "The ACA Risk Corridors Will Not Stabilize The U.S. Health Insurance Marketplace in 2015," *Standard & Poor's RatingsDirect*, at 2-3 (Nov. 5, 2015).

82.     Despite the clear statutory mandate and its own multiple admissions of its obligations to the contrary, HHS has stated that it will not pay out any amounts in excess of what is paid in by QHP issuers this year.

*     *     *     *     *

83.     Regardless of the HHS's statements that it will manage the risk corridors program in a "budget-neutral" manner, and regardless of the acts of subsequent Congresses to limit the availability of certain funds to make payments owed to QHP issuers under the risk corridors program, the fact remains that the obligations of the Government under the ACA risk corridors program *have never been amended.*  Section 1342 mandates payment to QHP issuers under certain conditions *without regard to budget neutrality*, and for the very purpose of stabilizing the market by mitigating annual losses of participating plans, a fact especially crucial for new entrants who relied on the promise of Congress that cost overruns would be partially mitigated through reimbursement.  Notwithstanding subsequent agency pronouncements, *made only after QHP issuers such as Montana Health entered the market*, CMS's implementing regulation (Section 153.530) reflected the mandatory nature of the payments without regard to budget neutrality.

25

84.     Plaintiff relied upon the risk corridors program when it entered and participated in the ACA exchanges, and when it designed and priced its 2014 and 2015 plans.  At the end of benefit year 2014, Plaintiff was *owed* money based on its participation in both the individual and small group market.  HHS paid only a small fraction of the total that was due.  The remainder in the amount of $5,956,412.85 is owed and presently due.  By the same token, the $36,250,130.00 losses sustained in the risk corridors program for benefit year 2015, which have been properly calculated pursuant to the formula written into the ACA, and properly documented, and properly submitted to CMS in accordance with the law, are owed to Plaintiff under the express terms of Section 1342 of the ACA.  By this lawsuit, Plaintiff seeks the immediate payment in full of risk corridors receivables for 2014 and immediate payment of risk corridors receivables for 2015, so that it can continue to offer affordable health insurance as contemplated by the ACA.

## CLAIM FOR RELIEF

## COUNT I

### (Violation of Statutory and Regulatory Mandate to Make Payments)

85.     Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

86.     As part of its obligations under Section 1342 of the ACA and its obligations under 45 C.F.R. § 153.510(b), the Government is required to pay any QHP issuer certain amounts exceeding the target costs they incurred in 2014 and 2015.

87.     Plaintiff is a QHP issuer under the ACA and, based on its adherence to the ACA and its submission of allowable costs and target costs to CMS, satisfies the requirements for payment from the United States under Section 1342 of the ACA and 45 C.F.R. § 153.510(b).

88.     The Government has failed, without justification, to perform as it is obligated

26

under Section 1342 of the ACA and 45 C.F.R. § 153.510(b), and has affirmatively stated that it will not do so.

89.     The Government's failure to provide timely payments to Plaintiff is a violation of Section 1342 of the ACA and 45 C.F.R. § 153.510(b), and Plaintiff and has been harmed by these failures.

COUNT II

(Breach of Implied-In-Fact Contract to Make Payments)

90.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

91.     Plaintiff entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely risk corridors payments to Plaintiff in exchange for Plaintiff's agreement to become a QHP issuer and participate in the Montana and Idaho Marketplaces.

92.     Section 1342 of the ACA, HHS's implementing regulations (45 C.F.R. § 153.510), and HHS's and CMS's repeated admissions regarding their obligation to make risk corridor payments were made by representatives of the Government who had actual authority to bind the Government, and constituted a clear and unambiguous offer by the Government to make full and timely risk corridor payments to health insurers, including Plaintiff, that agreed to participate as QHP issuers in the ACA Marketplaces.

93.     Plaintiff accepted the Government's offer by agreeing to become a QHP issuer, accepting the obligations, responsibilities, and conditions the Government imposed on QHP issuers under the ACA, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq*, and proceeding to provide health insurance on Montana and Idaho Marketplaces.  Plaintiff satisfied and

27

complied with its obligations and/or conditions which existed under the implied-in-fact contract.

94.    The Government's agreement to make full and timely risk corridor payments was a significant factor material to Plaintiff's decision to participate in the ACA Marketplaces.

95.    The parties' agreement is further confirmed by the parties' conduct, performance and statements following Plaintiff's acceptance of the Government's offer, and the Government's repeated assurances that full and timely risk corridor payments would be made and would not be subject to budget limitations. *See, e.g.*, 78 FR 15409, 15473 (Mar. 11, 2013).

96.    The implied-in-fact contract was also supported by mutual consideration:  The risk corridors program's protection from uncertain risks and new market instability was a real benefit that significantly influenced Plaintiff's decision to agree to become a QHP issuer and participate in the ACA Marketplaces.  Plaintiff, in turn, provided a real benefit to the Government by agreeing to become a QHP issuer and complying with its obligations and/or conditions, as adequate insurer participation was crucial to the Government's achieving the overarching goal of the ACA exchange programs—to guarantee the availability of affordable, high-quality health insurance coverage for all Americans by protecting consumers from increases in premiums due to health insurer uncertainty.

97.    Congress's failure to appropriate sufficient funds for risk corridor payments due, without modifying or repealing Section 1342 of the ACA, did not annul the Government's contractual obligation to make full and timely risk corridor payments to Plaintiff.

98.    The Government's failure to make full and timely risk corridor payments to Plaintiff is a material breach of the implied-in-fact contract, and Plaintiff has been damaged by this failure.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

A.      That the Court award Plaintiff monetary relief in the amounts to which Plaintiff is

entitled under Section 1342 of the Affordable Care Act and 45 C.F.R. § 153.510(b), in the

amount of $5,943,248.14 (for benefit year 2014) and $36,250,130.00 (for benefit year 2015).

B.      That the Court award pre-judgment and post-judgment interest at the maximum

rate permitted under the law;

C.      That the Court award such court costs, litigation expenses, and attorneys' fees as

are available under applicable law; and

D.      That the Court award such other and further relief as the Court deems proper and

just.


Dated: October 28, 2016                     Respectfully submitted,

                                            Stephen McBrady, Esq.
                                            CROWELL & MORING LLP
                                            1001 Pennsylvania Avenue, NW
                                            Washington, DC 20004
                                            Tel: (202) 624-2500
                                            Fax: (202)-508-8989
                                            SMcBrady@crowell.com

OF COUNSEL:

Daniel Wolff, Esq.
Xavier Baker, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500

John Morrison, Esq.
MORRISON, SHERWOOD, WILSON, & DEOLA PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, Montana  59624